M. L. BOSTON, Appellee, v. KEOKUK ELECTRIC COMPANY, Appellant.

October 16, 1928.

O'Harra, Walker & Sheridan, for appellant.

E. W. McManus, for appellee.

Albert, J.—I. The first question raised in the case involves a ruling by the court sustaining objection to one Robinson as a juror, on the ground that he stood in the relationship of employer and employee. The examination of this juror is too extended to set out in an opinion, but, briefly stated, the juror was an employee of the Mississippi River Power Company, a corporation organized under the laws of the state of Maine. The defendant, the Keokuk Electric Company, is an Illinois corporation, and purchases power and electricity from the Mississippi River Power Company. The North American Company controls the Union Electric Light & Power Company of St. Louis. The juror further said:

"As I understand it, the Union Light & Power Company of St. Louis controls the Keokuk Electric Company. As I understand it, the Union Light & Power Company of St. Louis, either through its stockholders or directors, controls the Keokuk Electric Company, as well as the Mississippi River Power Company."

It would seem, from this line of testimony, that the control

of these various companies referred to by the juror comes from interlocking stockholders or directorships.

This is a sufficient statement for the purpose of the question under consideration.

The appellant insists that the exclusion of this prospective juror by the court, under these circumstances, was error. If we assume, without deciding, that the ruling of the court in this respect was error, has the appellant any right to complain because of said action of the court? Two wholly different situations may arise when this question is before the court: One, where the court does not allow the juror to sit; the other, where the litigant is compelled to accept the juror, against his protest. In other words, a different situation arises where the juror is excused, from where the juror is accepted. If this thought is kept in mind, the ruling of this court on this proposition is quite clear. In *State v. Crouch,* 130 Iowa 478, the complaint against the juror was his inability to read, write, or understand the English language. The challenge was sustained, and this court said:

''This was also a matter resting peculiarly within the sound discretion of the trial court; and there is no such showing here as to justify our interference * * * [citing cases]. Of necessity, this question is primarily for the trial court; and it must be a strong case which will justify an appellate tribunal in interfering. *Anson v. Dwight,* 18 Iowa 241. Defendant was in no manner prejudiced in having one excluded from the jury of even doubtful qualifications; and in many states it is held no ground for complaint even if a challenge on the part of the State is erroneously sustained. * * * It is not necessary to so hold now, and we refer to these cases to show the trend of authority.''

In *State v. Norman,* 135 Iowa 483, the challenge to the juror was on the ground that he had formed and expressed an opinion, which disqualified him for service, under the provisions of the Code. The court sustained the challenge, and the opinion says:

'' * * * the rulings of the court as to the grounds of challenge will not be interfered with, unless there is an abuse of the discretion with which it is vested; and, on reading the record,

we are satisfied that the ruling of the court was correct. Moreover, defendant cannot. complain of the exclusion of a juror by the court, unless some prejudice is made to appear; and there is nothing in the record to suggest that the defendant was unable to secure a fair and impartial trial by reason of the exclusion of the challenged juror from the jury box.''

In *Ingebretsen v. Minneapolis & St. L. R. Co.*, 176 Iowa 74, objection was made to a juror on the ground of his intimate relationship with the plaintiff. It was overruled, and the juror was then challenged peremptorily, and did not sit upon the trial. In the discussion the court said:

''So, also, if a challenge for cause which ought to be sustained is erroneously overruled, there is no prejudice to the challenger if he still has the opportunity to get rid of the objectionable juror by peremptory challenge. This has so often been held by the courts as not to be open to debate.''

In *State v. Kendall*, 200 Iowa 483, an objection to a juror was sustained, and in the discussion this court said:

''The weight of authority seems to be that it is not reversible error to exclude a juror for an insufficient cause if an impartial and unobjectionable jury is afterward obtained. * * * There is a material distinction between an error in retaining a disqualified juror, and rejecting one who is qualified; and the latter is. not material if it did not prevent a trial by a fair and impartial jury.''

A litigant cannot claim that he has a right to have any particular juror sit on the trial of his case. The most that he can claim is that he shall have a fair. and impartial jury. If a qualified juror has been wrongfully rejected by the court, it is. for the complainant to show that he was prejudiced thereby, before this court will say that such action on the part of the trial court was prejudicial error. There is nothing in the record before us to show, so far as this matter is concerned, that defendant did not have a fair and impartial jury; hence the action of the district court in excluding the juror did not work reversible error.

II. To a fair understanding of the further questions raised, at least a partial statement of the facts must be made:

At the time in question, defendant operated an electric railway in the city of Keokuk. About 9 o'clock on the evening of August 2, 1926, plaintiff boarded one of the defendant's street cars on what is known as "West K" street, the end of the line, to go to his home on the north side of the city, and paid his fare. The car first proceeded in an easterly direction for several blocks, and at the intersection of C and Reid Streets, turned to the right, and followed the track southerly along C Street for two blocks, where the track turns to the north at the intersection of C and Park Streets. There is a grade over which the car passes from Reid Street to Park Street, and at the bottom of this hill is a turn on Park Street. On the night in question, after making the turn and starting down the hill on C Street, the car gradually increased its momentum, and the motorman could not control it, either with the air brakes or the hand brakes; and, instead of making the turn at the corner of C and Park Streets, the car jumped the track, and proceeded on down C Street for approximately half a block, gradually edged over to the left-hand gutter, and stopped without any crash, and without turning over. Besides the motorman and the plaintiff, there were four or five other persons on the car,—a lady, a Sunday School teacher, with some members of her class, all girls. After getting off the car, plaintiff informed the motorman that he was not hurt, and joked with Anderson, the superintendent of the railway, about his ride. Some of the passengers say that, at the time they alighted from the car, they did not notice anything particular or unusual about the plaintiff; but one witness for the plaintiff testified that he seemed to be in a very nervous state, and kept asking where he was, and seemed to be hysterical. There is evidence tending to show that, when plaintiff reached home, he was exhausted, and could not sleep, and was nervous; also, that the accident so frightened and terrified him that he became afflicted with traumatic neurosis; that the same is permanent, and prevents him from performing his usual labors in assisting his wife or in following his old trade, that of a barber.

On the day following the accident, plaintiff went to Dr. Fegers, who testified to an examination and as to the condition he found. Plaintiff further testified that he had fre-

quent spells of dizziness, and was sleepless, was obliged to go to the bathroom several times during the night, and that his hands would go to sleep, and tingle; that he lost about 15 pounds in weight; that he could not drive his car at night; that he dreamed of wrecks, etc.; that he was unable to engage in his customary business; that he had frequent backaches and headaches, and his condition does not improve; and that he suffered none of these symptoms before the wreck. In some of these matters he is corroborated by other testimony. Two physicians who examined him testified that he was suffering from traumatic neurosis, and the testimony of each rather indicates that the prognosis for recovery was not very favorable.

III. A persistent assault is made on the instructions given by the court.

In *Ford v. Chicago, R. I. & P. R. Co.,* 106 Iowa 85, after citing our own cases, we say:

"Contradictory and conflicting instructions are almost universally held to be erroneous, except in cases where the court can say there was no prejudice. * * * From any point of view, the instruction was erroneous, and, as the error does not affirmatively appear to have been without prejudice, the case must be reversed."

In *Kerr v. Topping,* 109 Iowa 150, it is held that, when conflicting instructions are given, one of which announces a correct, and the other an incorrect, rule, the case must be reversed, since there is no means of knowing which one the jury followed.

In *Bascom v. Hoffman,* 199 Iowa 941, it is said:

"If for no other reason, this conflict between these two instructions would be ground for reversal. When conflicting instructions are given, one of which announces a correct view, and the other the incorrect one, the case must be reversed; for there is no means of knowing which one the jury followed [citing our cases]."

In *In re Estate of Richardson,* 202 Iowa 328, the lower court granted a new trial on the ground of conflicting instructions, and such action was affirmed by this court.

In the record before us, the first paragraph of Instruction 7 reads as follows:

"Defendant, as a carrier of passengers, was bound to exercise the highest degree of care and diligence for the convenience and safety of the plaintiff, and to this end it was its duty to see that nothing which human foresight could guard against happened in the management and control of its cars, their condition as to safety, and the condition of the roadbed at the point where the accident occurred, that would imperil the safety of passengers while being transported."

Further instructions are as follows:

"11. You are instructed that the defendant is not required to use the utmost degree of care which the human mind is capable of inventing, but is only required to use the highest degree of care and diligence which is reasonably practicable under the circumstances of the case in question. The defendant was not an insurer against accident, nor is the defendant compelled to insure the absolute safety of its passengers. What the defendant was required to do was to do all that human care, vigilance, and foresight could reasonably do, consistent with the practical operation of its road and car, in order to prevent injury to the plaintiff, its passenger."

"12. The jury are instructed that, while the defendant is bound to do all that human care and vigilance and foresight could reasonably do, consistent with the practical operation of its cars and track, in order to prevent injuries to its passengers, still the company does not insure the absolute safety of its passengers; and in this case, if the jury believe from the evidence that the injury complained of was occasioned by an internal or hidden defect in the construction of the car or the roadbed, which a fair and careful examination would not disclose, and which could not be guarded against by the exercise of the sound judgment and the most vigilant oversight and care, then the defendant is not liable for the injury so occasioned; and if you believe from the evidence that the injury to the plaintiff in this suit happened to him by mere accident, without any fault on the part of the defendant or its employees, then he cannot recover. If you believe from the evidence that the defendant exercised all reasonable, practical care, diligence, and

760

skill in the construction, preservation, and repair of its track, and in managing and operating its cars at the time and place of the accident, and that the accident could not have been prevented by the use of the most practical care, diligence, and skill, then the plaintiff would not be entitled to recover in this action."

When we compare the thought in these two instructions with the underlying thought in Instruction 7, above quoted, it is apparent that the instructions are in hopeless conflict. As suggested in our former opinions, no one can determine which of these instructions were followed by the jury; hence the error assigned, raising this question, is sustained.

Another complaint made against the instructions is that the court invaded the province of the jury, and in certain places in the instructions assumes or states that there was an injury to the plaintiff, while that is a disputed question of fact. At another place, in Instruction 7, it is said by the court that "the derailment in this case occurred while the car was proceeding down a steep grade." The question as to the steepness of the grade was a disputed question of fact; hence was for the jury.

The last paragraph of Instruction 7 reads as follows:

"Therefore, in seeking for a cause of the injury, it becomes necessary to inquire as to the cause of the derailment of the car, and whether there was any defect in the track, in the brakes, or any carelessness on the part of the motorman, or any negligence in the management of it at the time; because the circumstances indicate unmistakably that the cause of the accident was to be found in some of these matters, and they are the subject of inquiry as to this branch of the case."

This instruction invades the province of the jury, in so far as it tells the jury that:

"The circumstances indicate unmistakably that the cause of the accident was to be found in some of these matters."

Defendant submitted a hypothetical question to one of its experts, and objection was lodged against it that it con-

tained facts which the testimony did not prove or tend to prove.  Our rule on this proposition is well stated in *Adams v. Junger*, 158 Iowa 449, at 459, where it is said:

"Hypothetical questions put to an expert upon his examinations in chief should always be based upon facts which the testimony proves or tends to establish."

The objection lodged against the hypothetical question in the instant case was that it included a statement that, when the car finally left the track, and made a stop, he (plaintiff) was helped from the car, and was in a rather hysterical state at the time. The claim is that there was no evidence, and nothing tending to establish, that the plaintiff was in a hysterical state at the time. One witness called by the appellees states: "It seemed he was hysterical." We think this was sufficient to warrant the inclusion of this statement in the hypothetical question.

On motion for a new trial, appellant raised the question that the verdict is not sustained by the evidence, and is contrary to the evidence. We think appellant made a case for the jury, under the record; that the evidence is sufficient to sustain the verdict; and that the verdict is not contrary to the evidence.

Some other questions are raised, which are not likely to arise on a retrial of the case; hence we give them no further attention.

For the errors pointed out, the case is reversed.—*Reversed.*

STEVENS, C. J., and MORLING and WAGNER, JJ., concur.

DE GRAFF, J., concurs in result, but sees no conflict in the instructions.